IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DREEMA PRINCE, | ) | CASE NO.  1:13-CV-728 |
| *o/b/o* J.T.F., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | KENNETH S. McHARGH |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | MEMORANDUM OPINION & ORDER |
| | ) | |
| Defendant. | ) | |

This case is before the Magistrate Judge pursuant to the consent of the parties.  (Doc. 16).
The issue before the undersigned is whether the final decision of the Commissioner of Social
Security  (the "Commissioner") denying Dreema Prince's ("Plaintiff" or "Prince") application
for Supplemental Security Income benefits under Title XVI of the Social Security Act, 42 U.S.C.
§1381 *et seq*., on behalf of J.T.F., is supported by substantial evidence and therefore, conclusive.

For the reasons set forth below, the undersigned AFFIRMS the Commissioner's decision.

## I.      INTRODUCTION & PROCEDURAL HISTORY

Plaintiff filed an application for Supplemental Security Income benefits on behalf of
J.T.F. around November 18, 2009. (Tr. 133-35).  Prince alleged J.T.F. became disabled on March
1, 2004, due to suffering from a learning disorder and hyperactivity. (Tr. 167).  The Social
Security Administration denied the application initially and upon reconsideration. (Tr. 63, 69).
Thereafter, Prince was granted a hearing before an administrative law judge ("ALJ") to contest
the denial.  (Tr. 72, 79).

On November 10, 2011, Administrative Law Judge C. Howard Prinsloo convened a
hearing to evaluate the application. (Tr. 44-60).  Along with counsel, Plaintiff and J.T.F.

appeared before the ALJ. (*Id*.).  During the hearing, J.T.F.'s alleged onset date was amended to November 18, 2009. (Tr. 52).  On December 14, 2011, the ALJ issued an unfavorable decision denying Plaintiff's request for benefits. (Tr. 13-32).  Subsequently, Prince sought review of the ALJ's decision from the Appeals Council. (Tr. 6).  The council denied Plaintiff's request, making the ALJ's December 14, 2011 decision the final decision of the Commissioner. (Tr. 1-4). Plaintiff now seeks judicial review of the Commissioner's denial pursuant to 42 U.S.C. § 1383(c).

## II.     EVIDENCE

### A.  Personal Evidence

J.T.F. was born on April 15, 1996, and was 13 years old on the date the application was filed and 15 years old at the time the ALJ issued his opinion. (Tr. 61).  Accordingly, J.T.F. was considered an "adolescent." *See* 20 C.F.R. 416.926a(g)(2)(iv)-(v).

### B.  Medical & Educational Evidence

On October 15, 2009, Plaintiff called Beech Brook Treatment Center ("Beech Brook") requesting mental health treatment for J.T.F. (Tr. 344).  During the initial intake interview, Prince stated that she had regained custody of J.T.F. nine months earlier after she lost custody due to a relapse in drug use. (Tr. 348).  J.T.F. had been born drug addicted, experienced abuse in the past, and witnessed domestic violence between his mother and father. (Tr. 350, 352). Plaintiff explained that J.T.F. got along fairly well with herself and his siblings, had a few friends at school, enjoyed basketball and football, and fought with other students, but normally not physically. (Tr. 347).  A mental status examination of J.T.F. revealed impaired judgment and insight, infrequent homicidal and suicidal ideation, and a flat affect. (Tr. 352-53).  J.T.F. was diagnosed with depressive disorder, a learning disability, and attention-deficit/hyperactivity

disorder ("ADHD"). (Tr. 356).  He was assigned a global assessment of function score ("GAF") of 60, representing moderate symptoms. (*Id.*).[1]

On October 20, 2009, J.T.F. sought treatment at Beech Brook for what was reported as low self-esteem, anger, running away, staying out past curfew, academic struggles, and unprocessed past trauma. (Tr. 358).  Prince reported that she was working with J.T.F.'s school to create an individualized education program ("IEP").  J.T.F.'s diagnoses remained unchanged.

On March 11, 2010, J.T.F. underwent a consultative examination with psychologist Joseph Konieczny. (Tr. 385).  Prince participated in portions of the evaluation. (*Id.*).  J.T.F. was born drug-addicted, but suffered from no developmental delays as a result, and in the seventh grade had obtained above-average to superior grades, though he was reported to be enrolled in "slow learning classes." (Tr. 386).  J.T.F. also experienced some disciplinary difficulties. (*Id.*).

During the examination with Dr. Konieczny, J.T.F. "related pleasantly and easily," was cooperative, and his ability to concentrate and attend to tasks was unimpaired. (Tr. 387).  J.T.F. was subdued and reported episodes of sadness, but denied specific thoughts of suicide.  J.T.F.'s intellectual testing placed him in a range that could suggest mild mental retardation; however, Dr. Konieczny concluded that J.T.F.'s capabilities extended beyond that which would be displayed by an individual with such a diagnosis. (*Id.*).  Dr. Konieczny opined that J.T.F. suffered from borderline intellectual functioning, a learning disorder, adjustment disorder with depressed mood, and mild depression due to a long history of neglect and dependence. (Tr. 387-88).

---

[1] A GAF score "is a clinician's subjective rating, on a scale of zero to 100, of an individual's overall psychological functioning." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 503 n.7 (6th Cir. 2006) (*citing* DSM-IV-TR at 34).  A score of zero represents the most severe level of impairment in psychological functioning, and a score of 100, the most superior. *Id.*  A GAF score in the range of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."

On March 13, 2010, state agency consulting physician Cindy Mayti, Ph.D., completed a review of the record. (Tr. 391-96).  She opined that J.T.F. displayed less than marked limitations in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for oneself. (Tr. 393-94).  Otherwise, J.T.F. suffered from no limitations. (Tr. 394).

On April 12, 2010, J.T.F. attended a quarterly review at Beech Brook.  J.T.F. had improved in overall progress towards his goals and in managing his anger. (Tr. 414).  J.T.F.'s anger largely stemmed from unprocessed past experiences. (*Id.*).  Also in April 2010, J.T.F. underwent a neurological examination at Plaintiff's request, but no neurological abnormalities were discovered to warrant a further diagnostic workup. (Tr. 398).

A Beech Brook pharmacology report dated May 3, 2010 shows that Thomas Eppright, M.D., preformed an initial psychiatric evaluation of J.T.F. (Tr. 405).[2]  J.T.F. complained of anger, depression, and difficulty concentrating.  There were also reports of occasional suicidal thoughts, trouble sleeping, poor grades, hyperactivity, and conduct issues in school. (*Id.*).  During the mental status examination, J.T.F. was cooperative and attentive, with a blunted affect and dysthymic mood, but he denied suicidal and homicidal thoughts. (Tr. 406).  Dr. Eppright diagnosed depressive disorder and conduct disorder, but ruled out attention deficit hyperactivity disorder.  He assigned a GAF score of 45-50, representing serious symptoms. (*Id.*).  On June 14, 2010, Dr. Eppright filled out a prescription for Adderall. (Tr. 399).

In August 2010, state agency consultative examiner Douglas Pawlarczyk, Ph.D., conducted a second review of the record. (Tr. 427-32).  He assigned the same domain findings as state agency reviewer Dr. Mayti, except that he found a marked limitation in the domain of

---

[2] Dr. Eppright's signature on the May 2010 report is dated June 2010, but the report indicates that the examination occurred on May 3, 2010. (Tr. 525).

interacting and relating with others. (Tr. 429).   The doctor noted J.T.F. had received a suspension from school for fighting and an adjudication of delinquency with the juvenile justice system.  Dr. Pawlarczyk indicated that on reconsideration, J.T.F.'s mother reported his behavior was worse, and though J.T.F. had improved with medication, he lapsed at times and continued to show aggressive behavior.  However, Dr. Pawlarczyk also noted that J.T.F. was enrolled in YMCA programs without discipline problems. (*Id.*).

During March 2011, J.T.F. underwent a mental health assessment at Applewood Centers ("Applewood") with Laura Vajdich, M.A. (Tr. 245-63).   J.T.F.'s mother reported that he was having difficulty with too much energy, staying on task, irritability, arguing, inappropriate sexual behavior, and developmental delays. (Tr. 261).  His school reported frequent temper tantrums and mood swings. (*Id.*).  Though J.T.F. had expressed feelings of depression in the past, he did not do so during the assessment. (*Id.*).  In school, J.T.F. was earning grades of Bs and Cs and was performing to his ability level. (Tr. 257).  During a mental status examination, Ms. Vajdich reported reduced eye contact, reduced speech spontaneity, infrequent suicidal ideation, and significant developmental delays. (Tr. 252-53).  Otherwise, J.T.F.'s intellectual functioning, general functioning, thought content and process, perception, affect, and mood, were all "unremarkable." (*Id.*).  Ms. Vajdich assigned a GAF score of 65, representing mild symptoms over the past six months. (Tr. 261).

On July 29, 2011, a therapist at Beech Brook reported that J.T.F. had shown progress in the short period of time for which he had been receiving treatment through his individual service plan. (Tr. 536). J.T.F. was receiving good grades in school, was mannerly during the session, and participating in activities that helped to direct his energy in a positive way. (*Id.*).

On June 8 and June 29, 2011, J.T.F. was further evaluated by Applewood Centers' Heather Marcinick, M.A. (Tr. 448).  Ms. Marcinick was supervised by Frank Ezzo, Ph.D. (*Id.*). The report indicated that Plaintiff was concerned about J.T.F.'s aggression. (*Id.*).  Prince wanted additional educational services for J.T.F. through school, but the school felt that J.T.F. was not exhibiting academic or behavioral difficulties outside of the normal range. (*Id.*).  Plaintiff had previously requested an IEP, but the school had felt it was unnecessary. (Tr. 450).   Additionally, the report noted that Prince had been mistaken about J.T.F. being enrolled in special education classes. (*Id.*).  Prince reported that Vyvanse was effective in treating J.T.F.'s attention problems and his grades had improved to Bs and Cs with medication. (Tr. 457).  Part of the report stated Plaintiff "may have had a tendency to over report problems." (Tr. 453).

During the examination, J.T.F. displayed no problems with attention or hyperactivity, though he had taken his medication on the day of the appointment. (Tr. 451).  His affect was flat initially, but was euthymic as he became more comfortable. (*Id.*).  Price was instructed to request school accommodations to address J.T.F.'s cognitive deficits. (Tr. 457). It was recommended that J.T.F. attend cognitive behavior therapy and interpersonal psychotherapy. (*Id.*).

In August 2011, J.T.F. treated with Dr. Eppright, who reported that J.T.F. "continues to do well. . . . He has less impulsivity, distractibility, and hyperactivity.  His grades in school have improved. His appetite and sleep are good.  His mother is pleased with [h]is progress, she wants to continue on the medication." (Tr. 526).

On September 12, 2011, Dr. Eppright completed a functional report. (Tr. 476-80).  He opined that J.T.F. had four marked limitations in the domain of acquiring and using information. (Tr. 477).  Additionally, he identified one marked difficulty in interacting and relating; numerous

marked difficulties in attending and completing tasks; and one marked difficulty in caring for self. (Tr. 478-80).

On September 9, 2011, Jennie Hughes, J.T.F.'s tenth grade biology teacher, completed a functional questionnaire. (Tr. 279-84).  She indicated that J.T.F. had three marked difficulties in acquiring and using information, explaining that he did well when isolated from other students, but otherwise he became distracted. (Tr. 280).  Ms. Hughes found two marked and one extreme limitation in interacting and relating. (Tr. 281).  She explained that she isolated J.T.F. from other students because when he became distracted by them, he was uncontrollable. (*Id.*).  She assigned one extreme limitation in attending and completing tasks, in the area of being easily distracted. (Tr. 282).  Ms. Hughes noted one marked limitation in moving about and manipulating objects in the area of fine motor skills, observing that J.T.F. had poor handwriting. (Tr. 284).  Despite J.T.F.'s poor handwriting, Ms. Hughes acknowledged that J.F.T. was an athlete, implying that J.T.F. had the requisite motor skill in order to participate in such activities. (*Id.*).

Ms. Vajdich completed a functional questionnaire on September 12, 2011. (Tr. 286-90).  She opined that J.T.F. had four marked and one extreme limitation in acquiring and using information. (Tr. 287).  She explained that J.T.F. had "significant trouble with remembering new information and long term memory.  He has difficulty applying what he has learned." (*Id.*).  For interacting and relating, Ms. Vajdich identified four marked difficulties, which related to J.T.F.'s impulsivity and anger control. (Tr. 288).  She noted that J.T.F. "can often appear compliant and quiet but in other situations he has been violent/excessively angry with certain adults." (*Id.*).  Ms. Vajdich found multiple marked and extreme limitations in attending and completing tasks. (Tr. 289).  She stated that "[t]ransitions are difficult for [J.T.F.] as is tuning out distractions, organization, and dealing with a low amount of structure." (*Id.*).  The therapist identified one

7

marked limitation in poor hygiene and personal care, which she clarified that J.T.F.'s mother had identified. (Tr. 290).  She further stated that J.T.F. was "sometimes unaware of potential dangers to safety, ignores hygiene at home (looks clean/neat for school), loses things for school, forgets things." (*Id.*).

On September 13, 2011, a function report identifying Ms. Marcinick and Dr. Ezzo was completed. (Tr. 300-306).  In the domain of acquiring and using information J.T.F. had numerous marked and two extreme difficulties; various moderate to marked difficulties in interacting and relating; primarily marked difficulties in attending and completing tasks; and some marked difficulties in caring for self. (*Id.*).

In October 2011, Dawn Schmitt, C.N.P., competed a functional report. (Tr. 264-70).  For acquiring and using information Ms. Schmitt wrote, "[J.T.F.] is functioning at below grade level per maternal report, poor grades, has difficulty focusing.  I have no formal copy of IEP report to adequately address this." (Tr. 265).  Ms. Schmitt checked four marked difficulties in the domain of interacting and relating, explaining, "[p]er report from his mother [J.T.F.] has trouble with impulsivity and aggression when angered (i.e. throwing things at teachers, fighting with others, yelling)." (Tr. 266).  Under attending and completing tasks, the nurse identified two frequent difficulties, explaining that according to Plaintiff's and J.T.F.'s reports, the child had trouble focusing and work was hard for him to do. (Tr. 267).  Additionally, J.T.F. could perform self-help skills, but needed help with organization skills and staying on task. (*Id.*).

### III.    SUMMARY OF THE ALJ'S FINDINGS

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant was born on April 15, 1996.  Therefore, he was a school-age child on November 10, 2009, the date the application was filed, and is currently an adolescent.

8

2. The claimant has not engaged in substantial gainful activity since November 10, 2009, the application date.

3. The claimant has the following severe impairment: borderline intellectual functioning.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. The claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings.

6. The claimant has not been disabled, as defined in the Social Security Act, since November 10, 2009, the date the application was filed.

(Tr. 16-32) (internal citations omitted).

## IV.    STANDARD FOR CHILDHOOD SSI CASES

A child under age eighteen will be considered disabled if she has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations." 42 U.S.C. § 1382c(a)(3)(C)(i).  Childhood disability claims involve a three-step process evaluating whether the child claimant is disabled.  20 C.F.R. § 416.924.  First, the ALJ must determine whether the child claimant is working.  If not, at step two the ALJ must decide whether the child claimant has a severe mental or physical impairment. Third, the ALJ must consider whether the claimant's impairment(s) meet or equal a listing under 20 C.F.R. Part 404, Subpart P, Appendix 1.  An impairment can equal the listings medically or functionally.  20 C.F.R. § 416.924.

A child claimant medically equals a listing when the child's impairment is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 416.926(a).  Yet, in order to medically equal a listing, the child's impairment(s) must meet all of the specified medical criteria.  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  Sullivan v. Zebley, 493 U.S. 521, 530-32 (1990).

A child claimant will also be deemed disabled when he or she functionally equals the listings.  The regulations provide six domains that an ALJ must consider when determining whether a child functionally equals the listings.  These domains include:

> (1) Acquiring and using information;
> (2) Attending and completing tasks;
> (3) Interacting and relating with others;
> (4) Moving about and manipulating objects;
> (5) Caring for yourself; and,
> (6) Health and physical well-being.

20 C.F.R. § 416.926a(b)(1).  In order to establish functional equivalency to the listings, the claimant must exhibit an extreme limitation in at least one domain, or a marked impairment in two domains.  20 C.F.R. § 416.926a(d).

The regulations define "marked" and "extreme" impairments:

> We will find that you have a "marked" limitation in a domain when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities . . . [it] also means a limitation that is "more than moderate" but "less than extreme."  It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.

20 C.F.R. § 416.926a(e)(2)(i).

> We will find that you have an "extreme" limitation in a domain when your impairment(s) interferes very seriously with your ability to independently initiate, sustain, or complete activities . . . [it] also means a limitation that is "more than marked."  "Extreme" limitation is the rating we give to the worst limitations.  However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function.  It is the equivalent of the functioning we would expect to find on standardized testing scores that are at least three standard deviations below the mean.

20 C.F.R. § 416.926a(e)(3)(i).

During the evaluation of a child disability claim, the ALJ must consider the medical opinion evidence in the record.  20 C.F.R. § 416.927.  A treating physician's opinions should be

given controlling weight when they are well-supported by objective evidence and are not inconsistent with other evidence in the record.  20 C.F.R. § 416.927(c)(2).  When the treating physician's opinions are not given controlling weight, the ALJ must articulate good reasons for the weight actually assigned to such opinions. *Id.*  The ALJ must also account for the opinions of the non-examining sources, such as state agency medical consultants, and other medical opinions in the record.  20 C.F.R. § 416.927(e)(2)(i-ii).  Additionally, the regulations require the ALJ to consider certain other evidence in the record, such as information from the child's teachers, 20 C.F.R. § 416.926a(a), and how well the child performs daily activities in comparison to other children the same age.  20 C.F.R. § 416.926a(b)(3)(i-ii).

## V.    STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence and whether, in making that decision, the Commissioner employed the proper legal standards.  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  "Substantial evidence" has been defined by the Sixth Circuit as more than a scintilla of evidence, but less than a preponderance of the evidence.  *See Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524, 535 (6th Cir. 1981).  Thus, if a reasonable mind could accept the record evidence as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Id.*  While the Court has discretion to consider the entire record, this Court does not determine whether issues of fact in dispute would be decided differently, or if substantial evidence also supports the opposite conclusion.  The Commissioner's decision, if supported by substantial evidence, must stand.  *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).

This Court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility.  *See Garner*, 745 F.2d at 387.  However, it may examine all evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision.  *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

## VI.  ANALYSIS

Plaintiff challenges the ALJ's decision on a number of grounds.  For the reasons set forth below, these objections do not warrant remand or reversal as substantial evidence supports the ALJ's ruling.

### A.  Treating Source Opinions

Prince contends the ALJ erred in analyzing the opinions issued by J.T.F.'s treating psychologists, Drs. Ezzo and Eppright.  In September 2011, both psychologists issued functional questionnaires speaking to J.T.F.'s limitations.

When assessing the medical evidence contained within a claimant's file, it is well-established that an ALJ must give special attention to the findings of the claimant's treating source. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  The treating source doctrine recognizes that physicians who have a long-standing treating relationship with an individual are better equipped to provide a complete picture of the individual's health and treatment history. *Id.*; 20 C.F.R. § 404.1527(c)(2).  Under the Social Security Regulations, opinions from such physicians are entitled to controlling weight if the opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques," and (2) "is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2).

12

The treating source's opinions are not entitled to such deference, however, if they are unsupported by the medical data in the record, or are inconsistent with the other substantial evidence in the record.  *See Miller v. Sec'y of Health & Human Servs.*, No. 91-1325, 1991 WL 229979, at *2 (6th Cir. Nov. 7, 1991) (Table).  When the treating physician's opinions are not entitled to controlling weight, the ALJ must apply specific factors to determine how much weight to give the opinion.  *Wilson*, 378 F.3d at 544, *see* 20 C.F.R. § 404.1527(c)(2)-(6).  The regulations also advise the ALJ to provide "good reasons" for the weight accorded to the treating source's opinion. 20 C.F.R. § 404.1527(c).  Regardless of how much weight is assigned to the treating physician's opinions, the ALJ retains the power to make the ultimate decision of whether the claimant is disabled.  *Walker v. Sec'y of Health & Human Servs.*, 980 F.2d 1066, 1070 (6th Cir. 1992) (*citing King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984)).

### 1.  Dr. Ezzo

Plaintiff argues that Dr. Ezzo's opinion is entitled to controlling weight because he served as J.T.F.'s treating psychologist.  Furthermore, she asserts that the ALJ did not mention Dr. Ezzo's opinion or evaluate it in accordance with the treating source doctrine.

The regulations define a "treating source" as "your own physician . . . who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. §§ 404.1502, 416.902.  A nontreating source is "a physician . . . who has examined you but does not have, or did not have an ongoing treatment relationship with you." *Id.*  The ALJ will consider a claimant to have an ongoing treatment relationship when the medical evidence shows that the claimant has seen the source with "a frequency consistent with accepted medical practice for the type of treatment and/or evaluation

required for [the claimant's] medical condition(s)." *Id.*; *see Daniels v. Comm'r of Soc. Sec.*, 152 F. App'x 485, 490-91 (6th Cir. 2005).

Here, the record appears to reflect that Dr. Ezzo evaluated J.T.F. on only two occasions before completing the September 2011 functional questionnaire. (Tr. 306).  A "Psychological Evaluation" form issued by Applewood Centers, Inc., shows that J.T.F. was evaluated on June 8 and June 29, 2011 so that an assessment for clinical treatment could be completed. (Tr. 448-59). The evaluation form states that Heather Marcinick, M.A., a psychological assistant, served as the "examiner," and Dr. Ezzo was her "supervisor." (Tr. 448).  Both individuals signed the form.  It is unclear whether Dr. Ezzo was present for J.T.F.'s examinations.  Nonetheless, assuming that Dr. Ezzo did participate in the evaluation, two psychiatric examinations during the same month are insufficient to establish a treating relationship, as it is not a frequency consistent with the longitudinal nature of psychiatric treatment. *See, e.g.*, *Smith v. Astrue*, No. 4:11-CV-0863, 2012 WL 946852, at *6 (N.D. Ohio Mar. 20, 2012) (holding that two psychiatric visits only one month apart were insufficient to establish a treating relationship).  Plaintiff points to no other records of Dr. Ezzo treating J.T.F. that would support the psychiatrist's status as a treating physician.  As a result, Dr. Ezzo's opinion is not entitled to any special deference or analysis under the treating source doctrine.

Additionally, Plaintiff argues that the ALJ did not mention Dr. Ezzo in his opinion or evaluate evidence from the doctor.  While the ALJ did not expressly mention Dr. Ezzo, the ALJ accounted for both reports—the psychological evaluation and the functional questionnaire— issued with Dr. Ezzo's signature. (Tr. 21, 22, 300-06, 448-59).  It seems that the ALJ referred to these reports as being authored by Ms. Marcinick, because her name appeared on both reports.  It would have been preferable for the ALJ to acknowledge Dr. Ezzo's role, but any failure in this

14

regard is harmless, because the ALJ evaluated the reports and explained why he rejected the opinions to the extent that they conflicted with the RFC.

The ALJ did not fully credit the reports issued by Ms. Marcinick and Dr. Ezzo because they were based partially on reports from Plaintiff. (Tr. 25).  This observation is supported by substantial evidence.  The June 2011 psychological evaluation was based on a clinical interview of J.T.F. and psychological testing, but it also listed Prince as a source of information and contained many of Prince's reports. (Tr. 448).  As the ALJ observed, a portion of the psychological evaluation itself warned that Plaintiff tended to "over report problems" that J.T.F. exhibited. (Tr. 24, 453).  The ALJ found that Plaintiff was not entirely credible, and Plaintiff does not now challenge the credibility determination.  As to the September 2011 functional questionnaire, the report referred to J.T.F.'s full scale I.Q. score of 71 in support of the limitations listed therein. (Tr. 301).  No further support was noted, and Plaintiff points to no additional treatment notes from Dr. Ezzo outside of the psychological evaluation discussed here. It follows that the functional questionnaire must have been based on the information from the psychological evaluation, which included Plaintiff's reports.  As a result, the ALJ's opinion in regard to Dr. Ezzo is supported by substantial evidence.

### 2.  Dr. Eppright

Plaintiff also contests the ALJ's analysis of Dr. Eppright on the ground that the ALJ grouped the doctor with non-acceptable medical sources and failed to comply with the treating source rule.

Dr. Eppright's treatment of J.T.F. is also rather limited.  Before completing a functional questionnaire in September 2011, it seems that Dr. Eppright examined J.T.F. on two occasions, in May 2010 and August 2011. (Tr. 405-07, 526).  The record also contains a prescription from

Dr. Eppright for Adderall dated June 14, 2010. (Tr. 399).  Plaintiff does not point to any other treatment notes from the doctor.[3]  J.T.F. underwent additional counseling at Beech Brook, the facility at which Dr. Eppright practiced, but it is not apparent that Dr. Eppright was J.T.F.'s care provider for such counseling.  Given this evidence, it is a somewhat closer call as to whether Dr. Eppright's relationship with J.T.F. constituted a treating relationship.  For the purpose of this analysis, the Court will assume, without deciding, that Dr. Eppright was a treating physician.

Assuming Dr. Eppright's status as a treating source, the ALJ's evaluation of the doctor's opinion did not strictly comply with the mandates of the treating source rule. (Tr. 25).  However, if an ALJ does not strictly comply with the treating source doctrine, reversal and remand may not be required if the violation is *de minimis*. *Hall v. Comm'r of Soc. Sec.*, 148 F. App'x 456, 462 (6th Cir. 2005) (*citing Wilson*, 378 F.3d at 547).  A *de minimis* violation occurs "where the Commissioner has met the goal of 20 C.F.R. § 404.1527(d)(2)—the provision of the procedural safeguard of reasons—even though she has not complied with the terms of the regulation." *Id.* (*quoting Wilson*, 378 F.3d at 547).  In the present case, the ALJ's analysis sufficiently provides an understanding as to meet the goal of the treating source doctrine.

The ALJ determined that Dr. Eppright's check-sheet functional equivalency assessment was problematic, which is an argument against the supportability of the opinion. (Tr. 22).  This Court and others in the Sixth Circuit have questioned checkmark forms when unaccompanied by explanation or unsupported by a physician's notes. *See Doyle v. Comm'r of Soc. Sec.*, 2012 WL 4829434, at *9 (E.D. Tenn. 2012) (*citing Boley v. Astrue*, 2012 WL 680393, at *18 (E.D. Mich. 2012)); *Hyson v. Comm'r of Soc. Sec.*, 2013 WL 2456378, at *13 (N.D. Ohio 2013) (collecting

---

[3] Plaintiff points to a March 2011 report from Beech Brook listing J.T.F.'s diagnoses and describing J.T.F.'s individual service treatment plan.  Although Plaintiff indicates that the report was written by Dr. Eppright, the report was not signed by the doctor. (Tr. 411, 433-36).

16

cases that held the ALJ did not err by discounting a physician's opinion which used a checkbox form unaccompanied by explanation of the conclusions contained therein).

As the ALJ explained, Dr. Eppright did not offer written explanations for the checkbox limitations on the functional equivalency evaluation. (Tr. 22).  On the form in question, Dr. Eppright provided no written explanation, aside from a statement that J.T.F. took medication for ADHD. (Tr. 299).  Plaintiff does not assert that the doctor's treatment notes support the findings in the functional equivalency form.  J.T.F.'s May 2010 mental status examination with Dr. Eppright indicated that J.T.F. was cooperative and attentive, with a blunted affect and dysthymic mood. (Tr. 406).  J.T.F. denied current suicidal thoughts, though he did have such thoughts in the past that soon went away. (*Id.*).  Plaintiff reported that J.T.F. could not concentrate. (Tr. 405).  In school, J.T.F. was impulsive, distractible, and hyperactive. (*Id.*).  Yet, Dr. Eppright's subsequent treatment notes, issued the month before he completed the functional equivalency form, demonstrate that J.T.F. was doing better, as they described him displaying "less impulsivity, distractibility, and hyperactivity.  His grades in school [had] improved." (Tr. 526).  Plaintiff indicated that she was pleased with J.T.F.'s progress after taking medication for ADHD. (*Id.*).  Such statements do not support the degree of limitation the doctor suggested. Accordingly, the ALJ's assessment of Dr. Eppright is supported by substantial evidence.

### B.  Opinion Evidence From Other Sources

Plaintiff contends that the ALJ failed to appropriately evaluate the opinions of various "other sources," who submitted evidence.  These other sources were psychological therapist Ms. Vajdich, nurse practitioner Ms. Schmitt, and tenth grade teacher Ms. Hughes.

Social Security Ruling ("SSR") 06-03p explains how the Commissioner should consider opinions from sources who are not "acceptable medical sources," but rather, are considered

"other sources." SSR 06-3p, 2006 WL 2329939, at *1.  Among these other sources are therapists, nurse practitioners, and school teachers. Id. at *1-2.  Information from other sources cannot establish the existence of a medically determinable impairment; however, the Commissioner should consider such information because it may be based on special knowledge of an individual and may provide insight into the severity of the individual's impairments and how they affect the individual's ability to function. Id.  Additionally, SSR 06-3p states:

> Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

2006 WL 2329939, at *6.  SSR 06-3p also sets out factors to be considered when evaluating opinion evidence from medical sources that are not acceptable medical sources. Id. at *4-5. These factors include: how long the source has known the claimant, how consistent the opinion is with other evidence, the degree to which the source presents relevant evidence to support an opinion, specialization, and how well the source explains the opinion. Id.

Here, the ALJ's analysis of the three other sources at issue was sufficient for the Court to conduct a meaningful review of the ALJ's decision.  The ALJ expressly considered the reports of Ms. Vajdich, Ms. Schmitt, and Ms. Hughes, and provided detailed summaries of their findings. (Tr. 21-23, 25).  The ALJ indicated that the objective portions of the reports, including testing and observation, offered insight into the child's presentation, cognitive abilities, and daily behavior. (Tr. 25).  However, the ALJ gave weight to the reports only to the extent that they coincided with the findings in the remainder of the functional equivalence analysis. (Id.).  The ALJ explained that he granted such deference to the other sources because their reports relied on Plaintiff's subjective complaints.  In regard to Ms. Schmitt's opinion, the ALJ's reasoning is

accurate and valid.  A review of Ms. Schmitt's report shows that her findings were based largely, if not primarily, on reports from Plaintiff. (Tr. 265-68).  As previously discussed herein, the ALJ found that Plaintiff was not entirely credible.  Accordingly, substantial evidence supports the ALJ's finding with regard to Ms. Schmitt.

As to Ms. Vajdich, her opinion indicates that J.T.F. had marked difficulties with proper hygiene and personal care, which she found based on Plaintiff's reports. (Tr. 290).  Ms. Vajdich did not expressly state that she grounded the remainder of her findings on Plaintiff's statements. Nonetheless, the ALJ's opinion otherwise shows why the ALJ questioned the therapist's conclusions.  Ms. Vajdich found moderate to extreme difficulties in the domain of acquiring and using information, because J.T.F. had difficulty with remembering new information, long term memory, and applying what he had learned. (Tr. 22).  However, undermining Ms. Vajdich's recommendations of marked limitations were the ALJ's observations that J.T.F. had not been placed in special education classes, was denied an IEP evaluation because his academic progress was normal, and had made the honor roll in 2010. (Tr. 26).  Ms. Vajdich also assessed extreme difficulties in paying attention and staying on task without reminders. (Tr. 22).  However, at least during a consultative examination with Dr. Konieczny, J.T.F. did not display difficulties with concentration or attending tasks, drawing into question the severity of the limitation assessed by Ms. Vajdich. (Tr. 27, 387).

Based on a review of Ms. Hughes' functional report, it is not obvious that the teacher's opinions were influenced by Plaintiff.  However, any error on this ground is harmless because the ALJ's opinion again sets forth grounds for his decision with regard to Ms. Hughes.  The ALJ's discussion indicates that Ms. Hughes' opinion was not well supported. (Tr. 21-22).  For example, as the ALJ explained, Ms. Hughes found that J.T.F. suffered from marked difficulties

in fine motor skills on the ground that J.T.F.'s handwriting was poor. (Tr. 22).  Without more, poor handwriting was an insufficient reason to find the child's fine motor skills were so markedly affected, and as the ALJ noted, there appeared to be no evidence that J.T.F.'s handwriting was affected by fine motor problems. (Tr. 30).  J.T.F.'s ability to participate in sports, which Ms. Hughes herself acknowledged, and play video games also contradicted such a serious motor limitation. (Tr. 22, 30).  Additionally, the ALJ explained that Ms. Hughes found that J.T.F. suffered from a number of marked difficulties in skills related to acquiring and using information. (Tr. 21).  Despite this, Ms. Hughes also noted that J.T.F. performed well as long as he was isolated from other students, which seemed to draw into question the degree of limitations she recommended. (*Id.*).  Accordingly, the ALJ's decision not to fully credit Ms. Hughes was substantially supported.

### C.  The ALJ's Finding at Step Two

The second step in the sequential analysis is used as a screening tool, permitting ALJs to dismiss "totally groundless" claims from a medical standpoint at an early stage in the analysis. *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988).  At this step, the claimant must show that he has an impairment which significantly interferes with his ability to do basic work activities. *See* 20 C.F.R. § 416.920(c).  The ALJ's ruling here is viewed under a *de minimis* standard. *Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 691-92 (6th Cir. 1985); *Childrey v. Chater*, 91 F.3d 143 (6th Cir. 1996) (Table).  Accordingly, a claimant's impairment will only be construed as non-severe when it is a "slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work irrespective of age, education and work experience." *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 90 (6th Cir. 1985) (*citing Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)).

Nevertheless, an ALJ's failure to properly name one of a claimant's impairments as severe will not always constitute reversible error.  Remand is not necessary, so long as the ALJ finds the claimant to suffer from at least one severe impairment and continues to evaluate both the claimant's severe and non-severe impairments at the latter stages of the sequential analysis. *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009) ("And when an ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, an ALJ's failure to find additional severe impairments at step two does 'not constitute reversible error.'") (*citing Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) ).

In the present case, Plaintiff argues that the ALJ erred in concluding that J.T.F.'s depression and ADHD were not severe impairments.  Regardless of whether the ALJ may have erred in this regard, remand is not warranted, because the ALJ found that J.T.F. suffered from the severe impairment of borderline intellectual functioning. (Tr. 16).  Throughout the remainder of the sequential analysis, the ALJ accounted for J.T.F's ADHD, mood problems, and depression. (*See, e.g.*, Tr. 18-21).  As a result, any error here is harmless.

### D.  The ALJ's Functional Equivalency Determination

Prince raises two additional allegations of error relating to the ALJ's functional equivalency assessment.  First, she maintains that state agency reviewing physician Dr. Pawlarczyk opined that J.T.F. displayed a marked limitation in the domain of interacting and relating to others, in support of finding that J.T.F. suffered from marked functional limitations in at least two domains.  However, the ALJ explained why he did not accept Dr. Pawlarczyk's finding. (Tr. 28-29).  The ALJ pointed out that earlier state agency reviewers opined J.T.F. had less than marked limitations in this domain.  However, on reconsideration, Dr. Pawlarczyk opined that J.T.F. had marked limitations based on reports from Prince that J.T.F.'s behavior was

21

worse, and though medication helped, J.T.F. lapsed at times. (Tr. 28-29, 425).  Due to the doctor's reliance on Prince's reports, the ALJ discounted the opinion. (Tr. 28-29).  The ALJ also provided other reasons in support of finding a less than marked limitation.  The ALJ considered J.T.F.'s school records showing suspensions for inappropriate language and Ms. Hughes's report of isolation from other peers due to behavior.  However, the ALJ explained that other evidence showed J.T.F. participated in YMCA programs and sports teams without disciplinary problems and was regularly cooperative during treatment.  (*Id.*).  Accordingly, substantial evidence supports the ALJ's decision in this regard.

Plaintiff also contends that the ALJ's acquiring and using information domain analysis is internally inconsistent.  The ALJ's analysis under this domain indicated that the ALJ intended to find a "less than marked limitation," but the ALJ's conclusion stated that J.T.F. exhibited a "marked limitation." (Tr. 26).  While the ALJ's discussion creates an ambiguity, a further reading of the ALJ's decision provides the necessary clarification.  Earlier in his opinion, the ALJ wrote that he agreed with the assessments of the state agency physicians that J.T.F. had "less than marked limitations in the domain[] of acquiring and using information." (Tr. 24).  As a result, the ALJ's concluding reference to a marked limitation must have been a typographical error and remand for further explanation would be futile.

## VI.  DECISION

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is supported by substantial evidence.   Accordingly, the Court AFFIRMS the decision of the Commissioner.

IT IS SO ORDERED.

s/ Kenneth S. McHargh
Kenneth S. McHargh
United States Magistrate Judge

Date:  June 4, 2014.

23